Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Tammy Wagner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| TAMMY WAGNER,<br><br>            Plaintiff,<br><br>vs.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA; and DOES 1 through 10, inclusive,<br><br>            Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |

## INTRODUCTION

1.     Plaintiff Tammy Wagner ("Plaintiff") worked as an EKG technician and medical assistant until a major car accident changed her life and left her disabled.  A sports utility vehicle "T-boned" her car while traveling at 45 miles per hour.  Plaintiff's car spun out of control and struck two other vehicles.  As a result of her accident, Plaintiff suffers extensive back and neck injuries.  She suffers from severe back pain, neck pain and headaches and pain in her legs.  Since that day, she has been unable to work.  The Social Security Administration ("SSA") acknowledged her severe disability status when it awarded Plaintiff Social Security Disability Insurance ("SSDI") benefits.  Through her work at her former employer Providence St. Joseph Health ("St. Joseph"), Plaintiff is covered under policy number FLK-0980231 (the "Policy"), a private long-term disability ("LTD") policy administered by Defendant Life Insurance Company of North America ("LINA").  LINA paid Plaintiff two years' worth of disability benefits under the Policy.  However, on October 15, 2020, LINA terminated Plaintiff's benefits.  Incredibly, LINA terminated Plaintiff's benefits, claiming that she was not disabled in any capacity even though it had previously acknowledged that Plaintiff had been disabled for years and even though Plaintiff's medical conditions had not improved during those two years.  LINA simply decided to terminate Plaintiff's benefits.  On appeal, LINA conceded that Plaintiff had some disabilities, but nonetheless it concluded that she could still work.  Once again, it concluded that Plaintiff could perform her own occupation, the very job that it had previously determined she could not perform.  Plaintiff still cannot work at this time and is totally disabled under the Policy.  Plaintiff now comes before this Court to compel LINA to pay her the benefits that she is owed under the Policy.

## JURISDICTION AND VENUE

2.      Plaintiff brings this action to recover benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

3.      Venue lies in the Central District of California, Southern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the breaches alleged occurred in this district and the ERISA-governed plan at issue was administered in part in this district.

## THE PARTIES

4.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California, a resident of the City of Huntington Beach in Orange County.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by St. Joseph, which plan is at issue in this action.

5.      LINA, at all times relevant, administered LTD benefits provided to Plan participants, including Plaintiff, by issuing the Policy to St. Joseph.  The Policy and the Plan promised to pay LTD benefits to Plaintiff should she become disabled.

6.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained;

Case No.:



1  DOES 1 through 10 are sued as principals or as agents, servants, attorneys or

2  employees of said principals, and all of the acts performed by them were within the

3  course and scope of their authority and employment.  Plaintiff is informed and

4  believes and thereupon alleges that each of DOES 1 through 10 is legally

5  responsible in some manner for the events referred to herein, and directly and

6  proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

7

8                              **FACTUAL BACKGROUND**

9

10  A.  **Plaintiff's Employment and the Policy**

11

12      7.      Plaintiff worked at St. Joseph as an EKG technician and medical

13  assistant until April 2018.  Her job involved extensive amounts of walking,

14  standing, kneeling, crouching and manipulation of objects.  She worked in a high-

15  pace environment where she was involved with administering EKGs to a wide

16  variety of patients daily.

17      8.      Through Plaintiff's employment, she was enrolled in the Policy.

18  The Policy provides that:

19      The Employee is considered Disabled if solely because of Injury or
        Sickness, he or she is:
20      1. unable to perform the material duties of his or her Regular
        Occupation; and
21      2. unable to earn 80% or more of his or her Indexed Earnings from
22      working in his or her Regular Occupation.

23      After Disability Benefits have been payable for 24 months, the
        Employee is considered Disabled if, solely because of Injury or
24      Sickness, he or she is:
25      1. unable to perform the material duties of any occupation for which he
        or she is, or may reasonably become, qualified based on education,
26      training or experience; and
27      2. unable to earn 60% or more of his or her Indexed Earnings.

        9.      The Policy further states that:

28

-3-



The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.
I) Anxiety disorders
2) Delusional (paranoid) disorders
3) Depressive disorders
4) Eating disorders
5) Mental illness
6) Somatoform disorders (psychosomatic illness)

If, before reaching his or her lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against his or her lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above. For purposes of this Limited Benefit provision, Schizophrenia, Dementia or Organic Brain Disease will not be considered as a Mental Disorder under this Policy.

**B.   Plaintiff's Disability and the Claims Process**

10.    On April 24, 2018, while Plaintiff was driving her car, another driver in a sports utility vehicle "T-boned" her car traveling at 45 miles per hour.  This caused her car to spin out of control and hit two other cars.  She lost consciousness for an unknown amount of time after hitting her head and striking her neck, face, left shoulder and back on the side of the vehicle.  Immediately following the accident, she felt confused, dazed, dizzy, nervous and weak.  She reported significant injuries to her neck and low back.  She was transported to a hospital emergency department and discharged.  She suffered numerous injuries from this accident and, in addition to her physical injuries, she developed debilitating PTSD (post-traumatic stress disorder).

11.    Due to the extensive nature of her injuries, Plaintiff never returned to work after her accident.

-4-



12.     On April 27, 2018, Plaintiff treated with Celia Gutierrez, PAC.  Ms. Gutierrez noted that Plaintiff suffered from numbness, tingling in the arms and legs and weakness.  Plaintiff felt dizzy and complained of back, neck and shoulder pain that she gauged as 8-9 out of 10.

13.     On May 1, 2018, Amir Shokrae, M.D., examined Plaintiff.  Dr. Shokrae advised Plaintiff to "stay off work until June 4, 2018.  She is advised to obtain brain MRI, cervical spine and lumbar spine MRI as well.  She needs to start aggressive course of physical therapy 3 times a week for period of 6 to 8 weeks."

14.     On May 7, 2018, Plaintiff underwent a series of MRIs.  The report for the MRI of her lumbar spine stated that:

> 1. There is a 6 mm disc extrusion in the right paracentral location at L5-S1 which mildly narrows the right lateral recess and deviates the traversing nerve roots at this location.  There is also moderate right neural foraminal narrowing.
> 2. Other additional bulges are present at L1-2, L3-4, and L4-5.
> 3. Up to mild central canal narrowing worse at L3-4.
> 4. Degenerative grade 1 retrolisthesis of L5 on S1.

15.     On the same date, Plaintiff also underwent an MRI of the cervical spine.  The MRI report explained that:

> 1. There is significant reversal of the normal cervical lordosis with grade 1 retrolisthesis of C5 in relation to C6.
> 2. Up to mild--moderate central canal narrowing, worse at C4-5 with mild anterior cord indentation.
> 3. Varying degrees of neural foraminal narrowing detailed above on a level by level basis.
> 4. No acute traumatic abnormality of the cervical spine.

16.     Plaintiff also underwent an MRI and magnetic resonance angiography ("MRA") of her brain.  The MRI and MRA report concluded that:

> 1. There is a 1.3 cm area of T2 prolongation in the white matter inferior to the right frontal horn as well as involving the right caudate head. This is nonspecific.  It probably relates to gliosis from previous subclinical insult, although other etiologies are not excluded.  A follow-up MRI in 3-6 months is recommended to ensure stability.
> 2. No acute intracranial abnormality.

Case No.:



3. Normal MRA of the brain.

17.     On May 9, 2018, Plaintiff began treatment with Carl Hess, M.D., a pain management specialist.  Dr. Hess noted that Plaintiff rated her pain at 8 out of 10 "most of the time."  She suffered pain in her head, right shoulder, arm and lower back.  He noted that her pain was "shooting, throbbing, splitting, fearful, piercing, nauseating."  Her pain worsened when sitting, standing, walking, coughing or bending forward.  He also discovered associated weakness and muscle spasms. Dr. Hess recommended a variety of treatments while Plaintiff underwent additional diagnostic testing.  These treatments included physical therapy and use of "opiates."

18.     On May 30, 2018, Dr. Shokrae reexamined Plaintiff.  Dr. Shokrae noted that Plaintiff still suffered from significant spasms and tenderness of the paraspinal and shoulder muscles.  He also noted the brain MRI's results that show a "1.3cm area of T2 signal abnormality in the white matter inferior to the right frontal horn and right caudate head" that was "remarkable."  He further noted that Plaintiff had problems with dizziness, blurred vision and difficulty with looking at monitors. She suffered from headaches, back pain and leg pain.  Dr. Shokrae concluded that Plaintiff needed to stay off work through June 30, 2018.  He also concluded that Plaintiff needed to have back surgery.

19.     On June 7, 2018, Gerald Alexander, M.D., saw Plaintiff for an orthopedic evaluation.  He noted that Plaintiff's lateral x-rays of the cervical spine showed "multilevel disk space narrowing and osteophyte formation with a cervical kyphotic deformity."  He noted "Advanced collapse was seen at L5-S1 but also to some extent at L3-L4 and L1-L2."  He also noted moderate central canal narrowing. He diagnosed Plaintiff with:

1. CERVICAL SPONDYLOSIS WITH DISK PROTRUSIONS AND RESULTANT SPINAL STENOSIS.
2. CERVICAL RADICULOPATHY WITH POSSIBLE MYELOPATHY.



3. MULTILEVEL LUMBAR DEGENERATIVE DISK DISEASE WITH ADVANCED COLLAPSE AND RETROLISTHESIS AT L5-S1.
4. A 6 MM RIGHT PARACENTRAL LUMBAR DISK EXTRUSION AT L5-S1.

20.    On June 28, 2018, Plaintiff treated with Michael Lowenstein, M.D., for a personal injury evaluation.  After a thorough examination, Dr. Lowenstein diagnosed Plaintiff with:

l. Cervical sprain and strain.
2. Multilevel cervical disc protrusion most significant at C4-C5 with 4 mm broad-based disc protrusion, mild-to-moderate central canal narrowing and slightly indenting the anterior cord and moderate bilateral neuroforaminal narrowing. Also, C6-C7 2 mm left paracentral broad based with moderate-to-severe left-sided neuroforaminal narrowing.
3. Cervical radicular pain left greater than right.
4. Cervical facet syndrome.
5. Lumbar sprain/strain.
6. Multilevel lumbar disc pathology most significant at L5-S l with 6 mm extruded disc.
7. Lumbar radicular pain left greater than right.
8. Headaches and intermittent dizziness.

21.    He also made the following initial treatment recommendations:

1. Obtain EMG/NCV reports for review.
2. Obtain Dr. Alexander's report for review.
3. I recommend lumbar epidural steroid injection directed towards the L5-S l level.
4. I recommend cervical epidural steroid injection directed to the left C6 level.
5. Follow up with Dr. Shokrae's neurologist as scheduled for re-evaluation.
6. Lumbar and cervical epidurals can be performed two weeks apart.
I would like to see the patient in follow up two to three weeks after the second epidural for re-evaluation and further treatment recommendations.



22.     Due to her inability to work, Plaintiff applied for SSDI benefits.  On July 11, 2018, the SSA generated a "Health Information Technology (HIT) Medical Report."  As part of this report, the SSA generated a "Prob List."  This list consists of various health conditions affecting the applicant.  For Plaintiff, the list was chronic pain syndrome, depressive disorder, "RSD upper limb" and radial neuropathy.  It also noted that Plaintiff "has daily pain 7-10/10 nighttime end of work day.  Has difficulties with ADL and house work, requiring assistance."

23.     In a Function Report dated August 7, 2018, Plaintiff explained to the SSA that she has great difficulty standing, walking, bending or squatting or lifting heavy objects because of her injuries.  She explained that she cannot sit for prolonged periods of time due to her chronic pain levels.  She explained that standing produces back and neck spasms.  She stated that her husband has to assist her with a wide variety of the tasks of daily living.  Walking for more than five minutes is problematic; it makes her need to rest.  Furthermore, she suffers from neuropathy and paralysis in her left foot.  She also suffers from problems with her sense of balance.  She explained that she cannot sleep through the night due to her chronic pain and that her head injuries made it difficult to concentrate and caused memory problems.

24.     In a "Function Report – Adult – Third Party" dated August 7, 2018, Plaintiff's husband described Plaintiff's various limitations.  In the report, he explained that Plaintiff suffers from chronic pain in her back, neck and left wrist.  She also suffers from neuropathy in her left foot.  She suffers from dizziness and side effects from her medications.  She cannot sit or stand for long periods of time.  He often assists her with a wide variety of basic tasks such as bathing and dressing.  Ultimately, he has to assist her with a wide variety of the tasks of daily living such as dressing, bathing, toileting, shopping and driving due to her difficulty with lifting, squatting, bending, standing, reaching, walking, sitting and kneeling.

Case No.:



25.     On August 23, 2018, Plaintiff again treated with Dr. Alexander. Dr. Alexander noted that various conservative treatments had failed to improve Plaintiff's condition.  She still suffered from significant pain.  The treatments had only provided temporary minimal benefit.  Dr. Alexander recommended back surgery.  Plaintiff consulted with two other doctors who disagreed with Dr. Alexander's recommendation and, thus, Plaintiff has yet to have back surgery.

26.     In a letter dated November 13, 2018, LINA approved Plaintiff's claim for LTD benefits under the Policy.  Plaintiff's benefits under the Policy began on October 21, 2018.  Undated internal notes from LINA document its reasoning in approving Plaintiff's claim.  It had concluded that Plaintiff could not perform even light work due to her condition.  LINA's medical personnel reviewed Plaintiff's claim and they noted that "[Ms. Wagner] has the following functional limitations: cannot constantly sit; cannot use left arm for frequent reach grasp and fine manipulation; cannot frequently stand and walk; cannot view and reach above shoulder height; cannot bend, stoop, kneel; and cannot lift/carry/push/pull objects over 20 pounds."

27.     In a Disability Determination and Transmittal form dated December 6, 2018, the SSA concluded that Plaintiff cannot work and is disabled under its rules. This determination relied upon a variety of reasons.  The "Primary Diagnosis" was "Disorders of Back (Discogenic and Degenerative)."  The "Secondary Diagnosis" was "Depressive, Bipolar and Related Disorders."  The form further stated that the "Disability Began" on November 6, 2018.

28.     In a letter dated January 5, 2019, the SSA explained that it had concluded that Plaintiff was disabled as of November 6, 2018 and entitled to full benefits starting in May 2019.  Plaintiff continues to receive SSDI benefits.

29.     On February 20, 2019, Plaintiff underwent a CT scan because of her chronic headaches with "severe hypertension" in order to "rule out bleed."  The CT scan did not show any significant abnormalities.

Case No.:



30.  On March 10, 2019, Plaintiff underwent a brain MRI.  The MRI produced results that were largely identical to her previous brain MRI and revealed that she suffered from "Possible chronic microvascular ischemic disease."

31.  On April 24, 2019, Dr. Shokrae signed an Attending Physician Statement ("APS") for LINA, stating, "No prolonged walking, standing, working." These restrictions were due to Plaintiff's "concussion/lumbar stenosis."  It also noted Plaintiff's ongoing headaches, neck pain and back pain.

32.  On July 19, 2019, Plaintiff underwent a lumbar spine MRI.  The MRI report noted a "small Tarloc cyst at the sacral level."  It further noted that:

> L1-L2: Mild disc protrusion and disc desiccation resulting in mild canal narrowing.  No significant bilateral foraminal stenosis.
> . . .
> L4-L5: Mild disc protrusion and facet arthropathy causes mild bilateral foraminal and spinal canal stenosis.
> L5-S1: There is minimal retrolisthesis at this level.  Right paracentral mild disc protrusion results in mild bilateral foraminal and spinal canal stenosis.

33.  The report also noted that Plaintiff suffered from lumbar radiculopathy.

34.  On September 27, 2019, Plaintiff underwent a lumbar epidural injection to treat her back pain.  It provided limited relief.  As an apparent result of the injection, shortly thereafter, Plaintiff started to suffer heart palpitations.  The injection did not provide meaningful relief for Plaintiff's back problems.

35.  In November 2019, Plaintiff fell.  In the process, she hurt her left wrist. On November 11, 2019, she treated with Anthony Caldarone, M.D.  Dr. Caldarone noted that Plaintiff suffered from pain and decreased range of motion in her left wrist.  His initial physical examination did not note any physical abnormalities. Plaintiff's wrist pain continued and over time the pain spread to her "ulnar at both dorsal distal radio-ulnar joint and triangular fibrocartilage."  She suffers from pain when she both pronates and supinates her wrist, and her wrist even developed a "palpable click."





36.     On January 16, 2020, Plaintiff underwent an MRI of her left wrist. The MRI report states:

> 1. Widening of the scapholunate interval, with signal abnormality at the radial aspect of the ligament, consistent with rupture.
> 2. There is small fluid in the distal radioulnar joint and focal thinning of the triangular fibrocartilage, series 13 image 7 and series 12 image 23, that is suspicious for perforation.

37.     On February 13, 2020, Plaintiff agreed to use a short arm cast to treat her wrist pain.  Whereas Plaintiff wanted to undergo surgery, her doctors were unclear as to exactly where the rupture in the ligament was located and declined to perform it.  Ultimately, she ceased using the arm cast because it did not alleviate her wrist pain.

38.     Plaintiff's April 16, 2020 medical records document how her ongoing pain had worsened.  She resorted to taking three to four "opiates" per day to control her pain.  She continues to suffer from significant headaches and pain in her back, wrist and legs.

39.     On June 24, 2020, Marcia Hugen, M.D., one of Plaintiff's treating physicians, completed an APS.  In the APS, Dr. Hugen explained that her opinions were based on Plaintiff's various conditions and speaking with Plaintiff.  When reaching her conclusions, Dr. Hugen relied upon Plaintiff's back, neck and wrist problems.  She concluded that Plaintiff was severely limited in her ability to perform various basic activities.  Dr. Hugen explained that Plaintiff can only sit, stand and walk for one-third of the day, no more than 2.5 hours each.  She further noted that Plaintiff cannot lift or carry more than 10 pounds for more than 2.5 hours per day.

40.     In August 2020, Plaintiff's headaches started to worsen.  Plaintiff received injections of various medications in September 2020 to control her headaches.  The injections provided little relief.  Plaintiff's September 18, 2020 medical records note that Plaintiff suffers from what appear to be multiple types of headaches.  Some are migraines while others are tension-based.

Case No.:



41.     On September 8, 2020, Plaintiff underwent another CT scan due to her ongoing and severe headaches.  The CT scan report noted "No significant abnormality."

42.     As of September 24, 2020, Plaintiff still sought treatment for her neck pain, back pain and headaches.  Her doctors prescribed a variety of treatments, including physical therapy and pain medications.  Plaintiff's pain and disabling conditions continue.

43.      In a letter dated October 15, 2020, LINA terminated Plaintiff's claim for disability benefits (the "Denial Letter"), effective October 21, 2020.  In the Denial Letter, LINA explained that a "Nurse Case Manager and Medical Director" concluded that Plaintiff did not suffer from any functional limitations.  It completely discounted Dr. Hugen's medical analysis and relied on a few objective readings while ignoring Plaintiff's MRIs and personal reports of ongoing pain.  LINA had completed a transferrable skills analysis and concluded that Plaintiff could work in the *sedentary* occupations as a medical assistant and hospital admitting clerk.  LINA also casually dismissed Plaintiff's award of SSDI benefits.  It stated that the "Disability Determination Explanation in the SSA file revealed that you possess Light residual functional capacity, which is in agreement with our current decision …."  But LINA conveniently forgot that it asserted she could perform two *sedentary* occupations and that there was evidence from Plaintiff's doctors and from its own paper reviewer Dr. Polanco that she could not perform a sedentary occupation because of her sitting restrictions and limitations.

44.     Significantly, LINA adopted the position that Plaintiff could work at the exact same job that it had previously determined she could not perform due to her disability, even though there was no meaningful improvement in her condition.  This is completely opposed to the position that LINA had taken for the previous two years when it had paid disability benefits for the same disabling conditions.  In essence, LINA simply changed its mind.  This was improper.  *See Saffon v. Wells*



*Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled.  In order to find her no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration."); *Walke v. Group Long Term Disability Ins*., 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it initially granted.").

45.     On October 19, 2020, Plaintiff appealed the termination of her benefits. In her appeal, Plaintiff explained that LINA had erred in concluding that she could perform the occupations that it had listed in the Denial Letter.  She explained that one of the jobs that LINA had listed, "medical assistant," was part of her regular occupational duties, the very job that LINA had concluded she could not perform for the previous two years.  She further argued that LINA should heed Dr. Hugen and Dr. Shokrae, who had explained that Plaintiff could not perform that job's duties and, in fact, was severely limited in what job functions she could perform.

46.     On November 10, 2020, Dr. Hugen completed another APS in which she explained that Plaintiff **could not sit for more than 2.5 hours per day**. She also explained that Plaintiff could not lift or carry even negligible weights (10 pounds or less).  She further indicated that Plaintiff could not engage in a wide variety of other activities such as climbing, balancing, stopping, kneeling, crouching and crawling.  Dr. Hugen explained that these limitations were both due to problems with Plaintiff's spine and her discussions with Plaintiff.

47.     LINA arranged for Frank Polanco, M.D., to review Plaintiff's medical records.  He produced a report dated November 13, 2020.  In his report, Dr. Polanco acknowledged that Plaintiff suffered from "likely permanent" functional limitations. He concluded that Plaintiff has the following restrictions and limitations:

> - Occasional walking and standing (2.7 hours combined) limited to 15 minutes at one time

Case No.:



- Constant sitting
- No crawling, or climbing,
- Occasional stooping, and bending,
- Frequent reaching at all planes, gripping, grasping, and fingering
- Occasional lifting and carrying to 20 lbs., push 30 lbs.
- Full-time, 40 hours, 5 days per week

48.     Of note, contrary to LINA's assertions, Dr. Polanco concluded that Plaintiff suffers from extensive physical limitations.  He stated that "as a result of the claimant's chronic neck, thoracic and back pain as well as her physical status, she is limited her ability to be able to perform frequent, prolonged, and strenuous physical/work activities."  He only disagreed with Dr. Hugen and Dr. Shokrae about the severity of those limitations.  Dr. Polanco concluded that Plaintiff did not suffer from Dr. Hugen's reported limitations because her recent medical appointments had not produced objective measurements of Plaintiff's limitations.  However, of note, her recent medical appointments were "telehealth" appointments due to limitations arising from the COVID-19 pandemic.  Plaintiff was severely limited in the types of medical treatment that she could receive.  Dr. Polanco chose to use this limitation to justify taking the position that he knew LINA wanted him to take.

49.     Furthermore, Dr. Polanco concluded that "While restrictions are supported, the findings do not reflect that she is incapacitated, or incapable of full-time modified work activities as she retains a functional gate, mobility, strength, and has no focal neurological deficits."  This analysis failed to address Dr. Hugen's assessment that Plaintiff cannot sit for significant periods of time.  Dr. Polanco simply ignored this portion of Dr. Hugen's assessment.  He just concluded that Plaintiff can sit for extended periods of time.

50.     Ultimately, Dr. Polanco acknowledged that objective evidence supported Plaintiff's disability and relied thereon when concluding that Plaintiff had restrictions and limitations, yet insisted on different, specific, objective evidence that was not realistically available to her due to the pandemic.  In *Saffle v. Sierra*

Case No.:



*Pacific Power Co.*, 85 F.3d 455, 459-60 (9th Cir. 1996), the Ninth Circuit ruled that requiring a claimant to meet a standard not present in the plan "effectively imposes a new requirement for coverage," but because an insurer cannot rewrite the plan, to do so is improper. *See also Hagerty v. Amer. Airlines LTD Plan*, 2010 U.S. Dist. LEXIS 91995, *6 (N.D. Cal. Sept. 3, 2010) ("Numerous courts found it [in] error to require objective medical evidence of complaints that are inherently subjective in nature."). As such, Dr. Polanco's analysis ran contrary to the Policy and Plan documents.

51.     In a letter dated December 9, 2020, LINA asked Dr. Hugen two questions. In response, Dr. Hugen explained that:

> Patient is limited in routine normal physical activity such as walking due to chronic pain. Her neck and lower back pains cause her to have an unstable gait as well as numbness in her left foot. She has reduced strength in her hip flexors as well. She ambulates with a cane for stability. She also has reduced ROM and strength in her shoulder abduction as she is unable to use her back muscles fully for stabilization. It causes discomfort. She is unable to sit, stand, or walk for prolonged periods of time as she needs to adjust her position for comfort and less pain.

52.     In response to a question about what functional testing supported her medical assessment, Dr. Hugen explained that:

> [Plaintiff's] musculoskeletal examination shows reduced ROM and strength in her back, hips, shoulders, legs that make it difficult for her to complete full time light work activities. She needs assistance with many ADLs due to her pain and decreased strength. Patient already on full disability through the state.

53.     In a letter dated March 1, 2021, LINA denied Plaintiff's appeal (the "Denial of Appeal"). In the Denial of Appeal, LINA acknowledged that Plaintiff suffered from physical disabilities. However, it adopted Dr. Polanco's prescribed limitations and relied heavily upon his report to deny Plaintiff's claim. Strikingly, none of LINA's paper review doctors followed up with Dr. Hugen to determine

Case No.:



what he meant by the comment that "She is unable to sit, stand, or walk for prolonged periods of time as she needs to adjust her position for comfort and less pain." Moreover, Dr. Polanco opined that Plaintiff could not engage in "constant sitting." That statement is not inconsistent with Dr. Hugen's opinion that Plaintiff cannot sit for more than 2.5 hours per day, a situation that merits a finding of per se disability.[1] Yet LINA did not clarify with Dr. Polanco what he meant by no "constant sitting." He may have confirmed that he agreed with Dr. Hugen's statement that Plaintiff could not sit more than 2.5 hours per day.

54. LINA was also aware that Plaintiff was taking opiate medications and that her doctors reported that her physicians had reported that Plaintiff "is on chronic pain medications causing dizziness and lethargy." Yet when LINA requested that Dr. Polanco to comment on the "medication side effects," he ignored that question and did not comment on it. LINA failed to follow up with Dr. Polanco to get his opinion on the effects of Plaintiff's strong opioid pain and other medications on her ability to function at the jobs it asserted Plaintiff could perform.

---

[1] In *Armani v. Northwestern Mutual Life Insurance Co.*, 840 F.3d 1159 (9th Cir. 2016), the Ninth Circuit held that, where the claimant's attending physicians agreed that he could sit for, at most, four hours in an eight-hour workday, he was unequivocally disabled from performing his own sedentary occupation as a full-time controller (and from any other sedentary occupation), because sedentary jobs require mostly sitting, generally for at least six hours per day. *See also Mohamed Ahmed Mokbel-Aljahmi v. United Omaha Life Insurance Company,* 2017 WL 3700992 (August 28, 2017) (Sedentary work will generally involve sitting for at least six hours out of an eight-hour workday.). In *Wagenstein v. Cigna Life Insurance Co.*, 789 F. App'x 591, 592 (9th Cir. 2020) (citing *Armani*), the Ninth Circuit cited with approval its bright-line rule in *Armani* that an employee who cannot sit for more than four hours in an eight-hour workday is per se disabled from performing a sedentary occupation because sedentary work requires sitting most of the time. *Id.* The *Wagenstein* court rejected as contrary to law, i.e., as contrary to *Armani*, an insurer's vocational expert's opinion that an employee who could sit just 2.5 hours per workday "could perform two sedentary occupations." *Id.* at 592. The occupations that LINA asserts Plaintiff can perform are classified as sedentary occupations.

55.     Of note, LINA acknowledged that Plaintiff was attempting to receive treatment and was seeing her doctors via electronic means, but it then criticized the lack of objective measurements, even though seeing a doctor in person during the COVID-19 crisis was very difficult and was to be done only for emergencies, a limitation that Plaintiff respected.  In essence, LINA used the COVID-19 pandemic to its advantage and as a further excuse to deny Plaintiff's claim for benefits.

56.     Once again, LINA casually dismissed Plaintiff's award of SSDI benefits and stated that the award did not alter its opinion on Plaintiff's disability.

57.     The opinions of Plaintiff's highly qualified treating physicians, who regularly examined her for years and spoke with her in detail, carry far more weight than those of LINA's "paper reviewers," because he had a better opportunity to assess Plaintiff's credibility and functional abilities.  *See Williams v. United Omaha*, 2013 WL 5519525, at *12 (N.D. Ala. Sept. 30, 2013), citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).  Indeed, Courts have typically afforded greater weight to the opinions of physicians who have treated the claimant for an allegedly disabling condition for a long period of time.[2]

58.     In addition, by highlighting statements in the claim file that support a denial of Plaintiff's claim while ignoring pertinent evidence to the contrary, both LINA and its physician consultants engaged in an arbitrary and biased handling of

---

[2] *See, e.g., Kibel v. Aetna Life Ins. Co.*, 2015 WL 858751, *7 (C.D. Cal. Feb. 26, 2015) ("The record's great constant is Dr. Andersson: he was a board-certified neurologist that treated Ms. Kibel from her disease's inception, including numerous in-person examinations. Thus, his reports are very credible"); *Hodjati v. Aetna Life Ins.*, 2014 WL 7466977, *14 (C.D. Cal. Dec.29, 2014); *Oldoerp v. Wells Fargo & Company Long Term Disability Plan*, 12 F.Supp.3d 1237, 1255 (N.D. Cal. 2014) ("when an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions"); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to the opinions of physicians who personally examined the patient and described plaintiff's inability to work in great detail).

Case No.:



Plaintiff's file.  That is improper under the law and establishes that LINA's decision was incorrect.  *See Winkler v. Metropolitan Life Ins. Co.*, 170 F.App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary"); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6 & n. 3 (E.D. MI. Mar. 10, 2010) (finding an administrator's decision to deny benefits to be arbitrary and capricious where a file-review physician's report indicated that the physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding").

59.     The Denial of Appeal also noted that Plaintiff has "the right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA) Section 502(a) following an adverse benefit determination on appeal."

### FIRST CLAIM FOR RELIEF

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against LINA and Does 1 through 10)

60.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

61.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

62.     At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan and the Policy.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, LINA violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

-18-



63.     LINA has failed to conduct a "full and fair review" of the claim denial, an act required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in LINA to make benefit determinations, no deference is warranted with regard to LINA's handling of this claim.  *See Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

64.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must carry out its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan on behalf of a party whose interests are adverse to the interests of the Plan, its participants or its beneficiaries.  LINA's handling of Plaintiff's disability benefit claim falls far short of these standards.

65.     For all of the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence and contrary to the terms of the Plan, the Policy and law.  LINA abused its discretion by deciding to deny this claim, as the evidence shows that its denial decision was arbitrary and capricious.  Further, LINA's denial decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105 (2008).  LINA's denial of Plaintiff's claim constitutes an abuse of discretion.

66.     As a direct and proximate result of LINA's denial of disability benefits, Plaintiff has been deprived of LTD benefits since October 21, 2020.

Case No.:



67.     As a direct and proximate result of the denial of her claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action, and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

68.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

69.     Plaintiff alleges all the same conduct against Does 1 through 10 as it does against LINA in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including LTD benefits.

2.     For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).

3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date when the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.

Case No.:



1      4.    For such other and further relief as this Court deems just and proper.

2

3    Dated:  June 23, 2021                    **McKENNON LAW GROUP PC**

4

5                                        By: _____
                                              ROBERT J. McKENNON
6                                             NICHOLAS A. WEST
                                              Attorneys for Plaintiff,
7                                             Tammy Wagner

8

9

10



11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: